# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

ANDRE L. SCOTT,

                         Petitioner,                    Case No. 22-CV-332-JPS

v.

LANCE WIERSMA,

                         Respondent.                    **ORDER**

## 1.    INTRODUCTION

On March 16, 2022, Petitioner Andre L. Scott ("Petitioner") filed a petition to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2254. ECF No. 1. Magistrate Judge William E. Duffin screened the petition on May 2, 2022 and set briefing in this matter. ECF No. 4.

Respondent filed an answer on July 1, 2022. ECF No. 8. On July 29, 2022, Petitioner filed a "stipulated motion" to enlarge the record. ECF No. 9. In a text order entered August 16, 2022, this Court granted the motion. On August 17, 2022, Petitioner filed a brief in support of his § 2254 petition. ECF No. 11. On October 13, 2022, Respondent filed a brief in opposition. ECF No. 14. On November 3, 2022, Petitioner filed a reply in support of his § 2254 petition. ECF No. 15. The petition is now fully briefed. For the reasons stated herein, the Court will grant the § 2254 petition.

## 2.    BACKGROUND

### 2.1    The Alleged Facts Giving Rise to Petitioner's Criminal Case

This § 2254 petition arises out of Petitioner's conviction in Milwaukee County Circuit Court Case No. 2009CF136. *See State of Wisconsin*

*v. Andre L. Scott*, No. 2009CF136 (Milwaukee Cnty. Cir. Ct. 2009), available at https://wcca.wicourts.gov/caseDetail.html?caseNo=2009CF000136&countyNo=40&index=0&mode=details.[1] Petitioner—an African American male born and raised in Chicago, Illinois[2]—was therein charged with three counts of battery, one count of disorderly conduct, and one count of kidnapping pursuant to Wis. Stat. § 940.31(1)(a).

These charges arose out of the following events, as recited by the Wisconsin Court of Appeals in *State v. Scott*, 953 N.W.2d 113 (Wis. Ct. App. Nov. 17, 2020). In December of 2008, Scott's then-girlfriend, C.S., ended their relationship. C.S. moved out of their shared residence and into an apartment with her sister. On two occasions thereafter, Petitioner showed up at the sister's apartment looking for C.S. On December 29, 2008, Petitioner went to the residence and allegedly began harassing C.S. and her family. ECF No. 8-10 at 40. Witnesses testified that he then punched C.S. in the face and "attacked" her brother. *Id*. at 44–45. When C.S.'s sister tried to run for the phone to call 911, Petitioner is alleged to have assaulted her as well. *Id*. at 48. On January 4, 2009, Petitioner tracked C.S. down at a McDonald's, allegedly grabbed her as she exited the building, and followed her to another location. He then allegedly assaulted her, confined her in a storage locker for several hours, threatened her life, and took her to his sister's house against her will.

---

[1] The information here presented is pulled from that docket unless otherwise noted.

[2] ECF No. 8-5 at 51.

### 2.2 Petitioner's Plea of Not Guilty; Inquiries into his Competency

On January 16, 2009, Petitioner pleaded not guilty as to all counts charged. He was, from this time forward, represented by Attorney Mark Lipscomb ("Lipscomb"). On January 23, 2009 at a scheduling conference, Petitioner's family informed Lipscomb that Petitioner had not been taking his psychotropic medications for the past year. Accordingly, a competency examination was ordered, and the Wisconsin Forensic Unit filed a competency report as to Petitioner.

In that report, dated February 24, 2009, Dr. Brooke Lundbohm, Psy. D. ("Dr. Lundbohm") diagnosed Petitioner with an adjustment disorder with mixed disturbance by emotions and conduct, and secondarily diagnosed him with a psychotic disorder. *Scott*, 953 N.W.2d 113, ¶ 6; ECF No. 8-5 at 50. The report noted that a family member of Petitioner confirmed that the family had a history of schizophrenia. ECF No. 8-5 at 51. It further noted that Petitioner did not receive his high school diploma, GED, or equivalent, having dropped out of high school at the age of 15. *Id*.

While Petitioner apparently denied to Dr. Lundbohm that he had any history of "major behavioral problems" or "mental health concerns," Dr. Lundbohm described him as having a "recent history of emotional disturbance and suicidal behaviors,"[3] and Petitioner's sister reported that he received governmental financial assistance due to his history of Paranoid

---

[3]A frequent theme over the course of Petitioner's criminal proceedings has been that he seems to deny his mental illness diagnoses. *See* ECF No. 8-18 at 12 ("[H]e's not receiving medications to help with the chemical imbalance that is the—at the heart of the schizoaffective disorder. And that's not because he's not been offered that treatment; it's because he's declined it due to a lack of insight into his illness and need for treatment.").

Schizophrenia. *Id*. at 51–52, 54. Notwithstanding his denial, Dr. Lundbohm confirmed that Petitioner had "received treatment, including inpatient hospitalization and the use of psychotropic medications, related to a diagnosis of Paranoid Schizophrenia" in Illinois. *Id*. at 52. She wrote in the report that "[w]hen not compliant with his medications, Mr. Scott reportedly manifests increased paranoia, racing thoughts, nonsensical speech, and unusual behaviors." *Id*. Petitioner's sister reported that Petitioner "believes himself to be the target of a conspiracy when actively symptomatic" and that he will "not sleep and will move from place to place in [an] effort to protect himself from people whom he believes are out to harm him." *Id*. His sister also reported that Petitioner had "not taken any psychotropic medications in approximately two years." *Id*.

The report noted that, following his arrest for the instant criminal case, Petitioner attempted suicide, was placed on suicide watch, and subsequently had contact with the psychiatric crisis services team. The records therefrom reflect "a discharge diagnosis of Adjustment Disorder, Unspecified." *Id*. In the weeks following his detention, Petitioner was described as demonstrating "increasingly bizarre and disruptive behaviors so extreme as to require housing on the special needs unit." *Id*. at 54. These behaviors included "religious preoccupation, delusional ideation, and paranoia"; "taking his clothes off while waiting in the bullpen following a court hearing"; and "screaming hysterically while kneeling against the wall of his cell," "as though he was responding to internal stimuli." *Id*. at 52.

In light of these behaviors, on January 31, 2009 Petitioner was placed on a trial period of medications, including Fluoxetine and Trazadone. He subsequently demonstrated increased "rational, calm, and stable behaviors" and was returned to the general population unit. *Id*. Petitioner

reported to Dr. Lundbohm, however, that he had ceased taking those medications one to two weeks before their clinical interview. *Id*. at 53. There is no indication in the record that he resumed taking them prior to trial.

At the time of their interview, Petitioner spoke to Dr. Lundbohm in a "calm, soft manner" and his "thoughts did not reflect any delusional themes." *Id*. Dr. Lundbohm reported that his "overall presentation did not demonstrate any overt signs of psychosis, thought disorder, or cognitive deficits" and that Petitioner flatly denied any "history of auditory and visual hallucinations." *Id*.

The report ultimately opined that Petitioner was competent to proceed. *Id*.; ECF No. 8-9 at 4 ("The opinion rendered by the doctor is that 'based upon the performance during the clinical interview, his apparent stabilization in jail, and his self-reported experience as a defendant, I would offer to the Court the opinion that Mr. Scott is presently competent to proceed.'"). Dr. Lundbohm wrote that Petitioner at the time of their interview "demonstrated the capacity to factually and rationally grasp his current legal situation," was able to identify the charges brought against him, was able to distinguish the seriousness associated with a misdemeanor versus that of a felony, and "reflected an appreciation for the essential elements of his charges and the potential consequences." He demonstrated an understanding of the roles of the court's actors, the plea bargaining process, and his basic plea options. ECF No. 8-5 at 54. Dr. Lundbohm concluded that Petitioner "demonstrated the capacity to make rational, independent, self-serving decisions regarding his current court case." *Id*. She so opined, however, with the express caveat that court staff and counsel should "remain alert to any substantial changes in [Petitioner's] mental status as such changes could signal a deterioration in psychological

functioning and warrant a review of his functional capacities as a defendant," in light of her "understanding that Mr. Scott recently discontinued taking the psychotropic medications prescribed to him." *Id*. at 55. She accordingly recommended that Petitioner "continue to have regular contact with the clinical staff at the CJF/HOC and comply with any treatment recommendations made." *Id*.

### 2.3 Competency Hearing; Finding of Competence

On February 27, 2009, the Milwaukee County Circuit Court held a hearing on the matter of Petitioner's competency. *See* ECF No. 8-9. The parties stipulated to the report and its finding that Petitioner was competent. *Scott*, 953 N.W.2d 113, ¶ 7. The record reflects that "the trial court asked Scott on the record if he had reviewed the report, talked to trial counsel about the report, and asked if Scott understood the report," and that Petitioner stated that he had done so and that he understood the report. *Id*. When the court asked Petitioner if he believed he was competent, Petitioner said he believed he was. *Id*. In light of these circumstances, the court found him competent to proceed.

### 2.4 Jury Trial

A jury trial began on August 31, 2009.[4] On September 2, 2009, the court held a colloquy with Petitioner regarding testifying on his own behalf. Outside of the presence of the jury, the court asked Petitioner whether it was correct that he wished to testify. ECF No. 8-13 at 4. To that inquiry, Petitioner responded:

A:     Somewhat, yes, your Honor.

---

[4] In other words, approximately six months had elapsed since the Wisconsin Forensic United had prepared a report as to Petitioner's competence and since the court had relied on that report in finding Petitioner competent.

> Q:   What do you mean "somewhat," Mr. Scott? Because, as you know, it's an either or proposition. You either testify or you don't, and that decision is completely and entirely up to you in consultation with your attorney. You have the right to testify, but you also have the right not to testify. However, now is the time you need to know as the jury is ready and we broke yesterday. So tell me do you wish to testify or not?
>
> A:   Well, if the same crowd is going to be here that we had yesterday, not meaning the state, jury and you and I. And just talking as far as the defendant, I mean— excuse me, the defendants.[5]
>
> Q:   The witnesses?
>
> A:   Yeah, witnesses that complained against me.
>
> Q:   I'll admit I'm a little confused.
>
> A:   Pretty much what I have to say was very discerning to the same things they were questioned on.

*Id.* at 4–5. The court afforded Petitioner some time to discuss the matter with Lipscomb. After a few minutes, Lipscomb informed the court that Petitioner wished to testify. *Id.* at 6. Petitioner confirmed that that was the case. *Id.* at 6–7.

> Q:   And you understand that, as I said earlier, you don't have to testify. You can if you wish to, but you don't have to, do you understand?
>
> A:   Yes, sir.
>
> Q:   And you're deciding freely and voluntarily after consulting with your attorney that you do wish to take the stand and testify in this case; is that correct?
>
> A:    Yes, sir.

---

[5]Petitioner was the sole defendant in his case.

*Id.* at 7. The court concluded that Petitioner made a knowing, willing, and voluntary waiver of his rights to not testify on his own behalf. In other words, he "waived his right to remain silent and chose to testify in his own defense." *Id.* at *4.[6] Petitioner began by testifying the following, apparently based off a written statement he had prepared:

> Your Honor. And the Court, state and jury and my fellow attorney,[7] it's time to putting in this agreed memory together has to be a very unfortunate believe saying much to describe various of my defense. Inside my innocence described forth of words that explains our short year-and-a-half relationship with [C.S].

> Myself, Andre Scott, met [C.S.] May 23rd after a night of being passionate. We returned again on the 28th of May and never left each others' sight. We called it true love at first sight and very fun and enjoying. We compared along through the time I've discovered she had to leave her residence because of a very small issue, and it was her ex-boyfriend who subjectively gotten her evicted.

> Why I asked because of the letter she received in the mail. I fortunately was told that her boyfriend had previously had a drug on him while entering her apartment. The (inaudible) had he was also arrested with and they took him to from her apartment. So the record was given to the landlord policies' office who recommended [C.S.] that she had to leave because of the issue which she tried to explain that it wasn't her fault . . . . And they gave him no retrieve of helping her by sending a letter which she honored the moment she had to leave that following.

ECF No. 8-13 at 15–16, 21.

The remainder of Petitioner's testimony at this point was similarly incoherent. He consistently made unintelligible statements and used words

---

[6]Petitioner was the sole defense witness.

[7]Petitioner is not an attorney.

that were inapplicable to the idea he seemed to be trying to convey. *See generally id*. at 19 ("So she comes to the seclusion thoughts that she going to get her money today.") ("By me overhearing ourselves let's wait until tomorrow, the next day—she retrieved so many thoughts as she hung up the phone like I told her."); ECF No. 8-14 at 18 ("I think [C.S] was, by me being stronger, balancing, not so far as much of my defense, but much to relieve that pain that—[C.S.] much fell worser than me, getting up before her and—and helping her up.").

This narrative testimony drew an objection. ECF No. 8-13 at 20. Lipscomb, as requested by the court, attempted to instruct his client to shorten the narrative. The trial transcript demonstrates that Petitioner had a difficult time understanding this directive. *Id*. at 21 (Petitioner stating "I didn't understand that. Can you run that by me again" in response to Lipscomb's instructions).[8] The court itself interjected to address Petitioner directly to attempt to focus the scope of his testimony. *Id*. at 22. Lipscomb's assistance improved matters only minimally:

Q:    Andre, are you able to make arrangements to go see her at or about December 29th at the address on South 5th Street?

A:    Excuse me. You skipped from the 29th from the night of Christmas—I mean the day of Christmas that I had called from the 24th of Christmas Eve when she first went to her mother's.

---

[8] He similarly did not understand questions on multiple occasions, but he was generally able to respond to them after repetition or clarification. ECF No. 8-14 at 22 (Q: "Who gives—who gives directions to the cab driver, and what directions were they?" A: "Who give what, directions?" Q: "What directions do we give the cab driver once we get in the cab and tell him where to go?") and at 33 (Q: "So the 28th of May, 2007, until some time around December of 2008, correct?" A: "Say that again.").

Q:      Directing your attention to the 29th, do you go over there to South 5th Street with her check that you received at your house at North 18th Street?

A:      That's moving so fast to the next address, it puts a lot of stress in between of what issues to be spoken of. That makes a lot of stress of what became what issue, and to what matters, what the argument was, and wherein between the argument came.

. . .

Q:      We're going to skip by Christmastime now, Andre. So just listen to me now.

. . .

Q:      So now you're all there the three of you, and who's there from the family of your girlfriend?

A:      Say that again.

Q:      You're at the apartment of [C.H.], but who's there?

A:      I'm not at the address for [C.H.] at all. I'm at the address of [C.H.] for her sister, [C.S.], which was my ex-girlfriend.

. . .

Q:      And what did you do next?

A:      Briefing speaking to [C.S.] in fundamental feelings that my hands was cold. It was wintertime. I touched her shoulder, just feeling fundamentally. She's, like, whoa, she wasn't mean. Oh, you're [sic] hands are cold.

*Id.* at 28–30. Lipscomb repeatedly had to guide Petitioner back on track to address the question that had been asked. ECF No. 8-14 at 6 (Q: "Andre, Andre, you testified to that this morning. I'm asking you again. How did— did you leave right after that?" A: "I'm explaining that, sir. To identify what was the verbal—how the battery took place." Q: "Okay." A: "Can you get

me to the details, please."). Even with his attorney's guiding questions, Petitioner's answers were not always responsive.

Some of the comments Petitioner made seemed to unintentionally undermine his own defense and raise questions about his guilt. *Id.* at 19 ("He quoted, No, and I was about to walk off, and he looked like I was about to attack him, and he flinches towards me, and I threw my hand, and he started swinging it down."), at 6 ("I'm explaining that, sir. To identify what was the verbal—how the battery took place."), at 25 ("We see that a police squad car—well, more than one police squad car, and we noticed that, that wasn't the place for us to go."), at 35 ("I don't remember or recall no past abuse. I remember anyone call it mischief. I think that, that I couldn't achieve in."), and at 36 ("She moved out the moment that the battery took place."); ECF No. 8-13 at 24 ("So focus[ing] on what really contributy [sic] to the mistaken identity of so much makes me treated myself in so many expressions. I come upon it to be notice that you all quoted I have not so much to say about the rest of things because you all have looks than just myself be sitting here crying, and wanted to know about the true feelings. The fact that really hurts just warrant that convict me myself.").

But despite the generally confusing nature of his testimony on direct examination, Petitioner was nevertheless able to dispute some of the accusations against him. ECF No. 8-13 at 31–34 ("Yes. I heard all those things, sir. But it didn't go that way."), (Q: "The testimony yesterday from [C.H.] was that you swung at her and she put her elbow up to deflect the possible blow and that she suffered injuries and fell to the carpeted floor; did that happen?" A: "No, sir."); ECF No. 8-14 at 20 (Q: "You remember seeing pictures during the course of this trial, a storage room with a number

of lockers on it and with maybe three mattresses on top of the lockers. Do you remember being in any such room?" A: "No, I do not." Q: "[C.S.] said that she was placed on top of the lockers when you picked her up and basically threw her on top of the lockers. Do you remember her saying that?" A: "The only time I ever remember picking [C.S.] up at the bottom of the stairs was the other entrance."), and at 32 (Q: "You're accused of abducting or taking [C.S.] away from where she was staying or residing against her will. Did you take or kidnap her from that South 5th Street address?" A: "No, I did not, sir.").

Petitioner's performance did not improve on cross-examination. He continued to provide non-responsive answers. *Id*. at 36 (Q: "And ultimately, in early December, you guys were living at what address, early December of 2008?" A: "Well, when we first met, we lived at 227 East—" Q: "No. I'm just—I understand. We went through all the other previous places that you guys lived.") and 66 (court stating: "I don't want to interfere; but, Mr. Scott, you still need to answer how exactly you ended up in the basement or garage area. That was the question."). He continued to require repetition and clarification in order to stay on track.

> Q:      So then after that, you became aware at some point that she actually got a restraining order against you, right?
>
> A:      On what partial? What do you mean by that, sir?
>
> Q:      [C.S.] got a restraining order against—
>
> A:      On what partial? What do you mean by that? During what time?
>
> Q:      After the 29th.
>
> A:      After the 29th?
>
> Q:      Yes.
>
> . . .

Q:      Hold on. I'm asking about the restraining order that
        [C.H] . . . well, [C.H.] got a restraining order against
        you as well?

A:      That's what you said.

Q:      And [C.S.] got a restraining order against you?

A:      Now, today, yes, because—

Q:      No. After—after December—

A:      Because of the battery, yes.

*Id*. at 50. He was at times argumentative and irritated on cross. *Id.* at 76
("What do you mean by that, sir?"). He continued to make very confusing
statements. *Id*. at 41–42 ("The moment I came, there were handcuffs at the
back of the door on the doorknob. Contributing what? I don't have any
thought. But further to my conscience, there was a time that abusive words
were even contract—I mean, contributing, coming from her sister towards
her."), at 43 ("I can hear more the verbal and the contributional [sic] feeling
that gave me content from [C.H.]."), at 51 ("Well, point of viewing in the
look of how the accident was an accident, I was just statistically not looking
at the other portions of the fights that was there taking place . . . ."), and at
72 ("And the nerve that it took off was a swing that he thought—it probably
wasn't going to take off from my end when I'm only—and he said, Hold
on, what time, because he's also certain, and I was just starting to walk
off."). *See also id.* at 56–59:

Q:      And you think you see this man paying for her food,
        how does that make you feel?

A:      How does that make me feel?

Q:      Yeah.

A:      It makes me feel like a religious person that just had a
        relationship with someone for a year and a half.

Q:      I don't know what that means.

A:  You asked me, and I gave you it.

Q:  So it makes you feel what; happy, sad, angry, what?

A:  What I was supposed to feel, sir.

Q:  What does that mean?

A:  I mean, which one should I feel, sir?

Q:  That's my question to you. What did you feel?

A:  This is my answer, sir.

…

A:  Okay. Sir, this is a copyright machine in front of me,
    too, also. I'm going to have my words based up with
    that as well, so . . .

Q:  What?

A:  Sir, I said, I want my words also matched up with the
    same things as a copyright, like you asked me triple
    times to come over, and then you give me another
    answer. I mean, you're mixing me up. I mean, which
    one do you want to participate on in giving more
    questions?

As on direct examination, Petitioner was able to dispute allegations against him notwithstanding the generally confusing nature of his testimony. *Id*. at 55 (Q: "And when you come—when they come out, that's when you come up and grab [C.S.] by the arm?" A: "No, I didn't grab [C.S.]."), at 59 (Q: "And then they start walking away from you across the parking lot, and you're still on the sidewalk, right?" A: "No. That wasn't true. We were walking together."), at 61 (Q: "And suddenly, you're dragging her down to the parking structure?" A: "No, I did not drag [C.S.] down to the parking structure."), at 68 (Q: "So when nine-year old [nephew] testified yesterday that you're dragging her and she's screaming for [C.H.], that didn't happen?" A: "No, that did not happen."), and at 78

(Q: "So when [C.S.] says that all of that happened, she's making it up?" A: "Absolutely.").

During trial, although both the court and opposing counsel expressed being confused by Petitioner's testimony, no express question was raised by either party, nor by the court, as to Petitioner's competency. *See* ECF No. 8-14 at 33 (opposing counsel telling Petitioner that there were "some parts [of Petitioner's testimony] that I had a little difficulty in understanding."). And on September 3, 2009, the jury found Petitioner guilty on two counts of battery and on the single counts of disorderly conduct and kidnapping.[9]

### 2.5 Sentencing

The court held a sentencing hearing on October 9, 2009, roughly five weeks after trial. ECF No. 8-16. The State there faulted Petitioner for going "untreated with his mental health" and for "refus[ing] treatment at times." *Id.* at 14. And in Lipscomb's statement to the Court, he stated the following:

> I think that it comes down to the fact that Andre Scott has a severe case of schizophrenia which I have a brief definition of. It's a psychosis marked by withdrawn, bizarre and sometimes delusional behavior and by intellectual and emotional deterioration. When we hear Andre Scott in this presentence report giving his example of what he thinks happened, I think you could clearly conclude that he's schizophrenic and delusional . . . . I'd ask that you take all these things into consideration with the idea that my client is schizophrenic and has been for some time, does have these mental health issues.

*Id.* at 16, 19. And, speaking on his own behalf, Petitioner seemed to be describing his mental illness when he stated the following:

---

[9]The jury found Petitioner not guilty on Count 3 of battery.

And I wish that I could change what's going on right with 10 years probation to prove that I do have the abilities exist and it's something in my head that messing with me before I eat something. And I don't know what to do. I don't know my next day. I got this movie in my face called a (inaudible). I watch it and again just about a while—(inaudible). And I'm real scared of it. And then about this other movie, something about a day after, you know, it's like those two things come out of my mind, and I go through psychologically crazy. I don't think that should be a real cause (inaudible) I don't think to save another worlds, and if I could go on probation I will.

*Id.* at 23–24. The court also acknowledged at sentencing Petitioner's severe mental illness and the issue of his competency:

The defendant as noted in the PSI and as noted in the doctor's report, the psychological evaluation was conducted months ago relative to his competency, does indicate that this defendant suffers from a history of paranoid schizophrenia. He does appear to me at times, though he certainly appeared competent during this case, I want to make that very clear, that is the opinion of the doctor,[10] that was my conclusion that he was competent to proceed in this case. I think there is evidence of some delusional thought patterns. The truth probably lies somewhere in between that there is minimization, and I think there's a degree of delusional thought from the defendant. . . . [T]here can be no doubt that Mr. Scott has significant mental health issues for which he needs counseling and medication.

…

He does need to be treated while he's in prison. He does have mental health issues. He needs to be treated appropriately. He needs treatment for his schizophrenia. He needs appropriate medication . . . .

---

[10]But again, that was not the conclusion of the doctor at the time of the trial, that was the conclusion of the doctor six months prior to trial.

Case 2:22-cv-00332-JPS   Filed 04/11/23   Page 16 of 34   Document 16

*Id.* at 28–29, 33. The court sentenced Petitioner to a total of 22 years to be served in the state system—twelve years of initial confinement followed by ten years of extended supervision. *Id.* at 34–35.

### 2.6    Postconviction Relief and Appeals

Postconviction relief and appellate efforts were thereafter substantially delayed due to continuing concern about Petitioner's competency. On June 9, 2016, Petitioner's postconviction counsel moved the Milwaukee County Circuit Court for a postconviction competency evaluation. In a report dated July 22, 2016, the Wisconsin Forensic Unit opined that Petitioner was not competent, but that he could return to competence with proper medication. *Scott*, 953 N.W.2d 113, ¶ 10.

On August 9, 2016, Petitioner filed a notice of appeal of his criminal conviction. Several days later, at a hearing before the Milwaukee County Circuit Court, the court found that Petitioner was not competent to proceed, found that he was not competent to refuse medication and treatment, ordered that he be involuntarily medicated to reach competency, and suspended the postconviction proceedings. *Id.,* ¶ 11. The Wisconsin Forensic Unit prepared a subsequent report, dated May 5, 2017, which concluded that Petitioner had regained his competency. *Id.,* ¶ 12. And in a May 7, 2017 hearing, the court concurred.

Postconviction counsel thereafter filed an additional motion for a competency evaluation. *Id.,* ¶ 13. The court granted the motion. In a report dated February 27, 2018, Dr. Deborah L. Collins, Psy.D. reported that Petitioner was not competent. The court concurred and ordered that Petitioner be involuntarily medicated to competency in order to proceed with his postconviction proceedings. Petitioner objected to being involuntarily medicated, and the matter went before the Wisconsin

Supreme Court. *See State v. Scott*, 914 N.W.2d 141 (Wis. 2018). The Wisconsin Supreme Court ultimately reversed and remanded, concluding that the involuntary medication order was issued prematurely and was invalid. *Id.*, ¶ 8.

On October 15, 2018, based upon the petition of postconviction counsel, the court appointed Petitioner a temporary guardian to make postconviction/appellate decisions on his behalf. *Scott*, 953 N.W.2d 113, ¶ 13. And on December 12, 2018, Petitioner—through postconviction counsel—filed a postconviction motion. *Id.*, ¶ 14. The Milwaukee County Circuit Court addressed that motion in an order dated March 13, 2019. ECF No. 8-5 at 43. The court therein acknowledged that Petitioner sought release or a new trial on the grounds that he was denied his right to procedural due process under *Pate v. Robinson*, 383 U.S. 375 (1966). The court denied the motion, concluding that it had "no reason to doubt the defendant's competency before, during, or after the trial based on the overall record." *Id.* at 44. The court asserted that it had "no problems understanding what [Petitioner] was testifying to with regard to the sequence of events and what his version of events was." *Id*. at 45.

Petitioner's postconviction counsel appealed this decision to the Wisconsin Court of Appeals. ECF No. 8-5 at 1. The issue there presented was "[w]hether the circuit court violated [Petitioner's] right to procedural due process under the 14th Amendment and *Pate v. Robinson*, 383 U.S. 375 (1966) by failing to conduct a competency hearing *sua sponte* despite a record revealing a reason to doubt [Petitioner's] competence at trial and sentencing[.]" *Id.* at 5. And on November 17, 2020, the Wisconsin Court of

Appeals affirmed in part and reversed in part the March 13, 2019 order of the Milwaukee County Circuit Court. *See generally Scott,* 953 N.W.2d 113.[11]

Specifically, the Wisconsin Court of Appeals concluded that the lower court "did erroneously exercise its discretion in finding that there was no reason to doubt Scott's competency at sentencing and, therefore, the trial court was obligated to order a competency examination prior to proceeding to sentencing." *Id.,* ¶ 3. It so concluded because "Scott's rambling and incoherent allocution at sentencing showed that there was reason to doubt his competency. Although some parts of Scott's statement appear to be assertions that he was innocent, much of it makes no sense." *Id.,* ¶ 49.

The Wisconsin Court of Appeals also concluded, however, that the lower court did not similarly err regarding whether there was reason to doubt Petitioner's competency at trial, just five weeks prior. *Id.,* ¶ 3. In affirming this part of the trial court's order, the Wisconsin Court of Appeals discussed solely Petitioner's performance at trial—it made no reference to or consideration of Dr. Lundbohm's report (nor her admonition that Petitioner's competency had the potential to deteriorate in light of his medication cessation), of Petitioner's history of suffering from paranoid schizophrenia, or of any other circumstance outside of that which occurred at trial.

Postconviction counsel now brings on Petitioner's behalf a § 2254 petition asking this Court to find that the Wisconsin Court of Appeals proceeded contrary to and/or pursuant to an unreasonable application of

_____

[11]The Wisconsin Supreme Court thereafter denied without opinion a petition for review. *State v. Scott*, 2022 WI 86 (Wis. 2019).

*Pate* when it affirmed the Milwaukee County Circuit Court's conclusion that it had no reason to doubt Petitioner's competency at trial. ECF No. 1.

**3.    STANDARD OF REVIEW ON HABEAS**

As a threshold matter, a defendant must be "in custody" to obtain habeas relief. *See Maleng v. Cook*, 490 U.S. 488, 490–91 (1989). The "in custody" language does not require that a defendant be physically confined in order to challenge this sentence on habeas corpus. *Id.* at 491. For example, a defendant who has been released from confinement and remains on supervision is still "in custody" for habeas purposes. *Id.*[12]

State criminal convictions are generally considered final. Review may be had in federal court only on limited grounds. To obtain habeas relief from a state conviction, 28 U.S.C. § 2254(d)(1) (as amended by the Antiterrorism and Effective Death Penalty Act ("AEDPA")) requires the petitioner to show that the state court's decision on the merits of his constitutional claim was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the United States Supreme Court. 28 U.S.C. § 2254(d)(1); *Brown v. Payton*, 544 U.S. 133, 141 (2005). The burden of proof rests with the petitioner. *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011). The relevant decision for this Court to review is that of the last state court to rule on the merits of the petitioner's claim. *Charlton v. Davis*, 439 F.3d 369, 374 (7th Cir. 2006).

───────────────

[12]The Court mentions this because, although the parties do not address it, Petitioner's current incarceration status is procedurally complicated. He is not presently confined, but he is still awaiting resentencing, which itself cannot occur until Petitioner is deemed competent. *See Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 894 (2d Cir. 1996) ("[A] person released on his own recognizance pending sentencing after a state court conviction is 'in custody' for habeas jurisdictional purposes . . . .").

A state-court decision runs contrary to clearly established Supreme Court precedent "if it applies a rule that contradicts the governing law set forth in [those] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of [the Supreme] Court but reaches a different result." *Brown*, 544 U.S. at 141. Similarly, a state court unreasonably applies clearly established Supreme Court precedent when it applies that precedent to the facts in an objectively unreasonable manner. *Id.*; *Bailey v. Lemke*, 735 F.3d 945, 949 (7th Cir. 2013).

The AEDPA undoubtedly mandates a deferential standard of review. The Supreme Court has "emphasized with rather unexpected vigor" the strict limits imposed by Congress on the authority of federal habeas courts to overturn state criminal convictions. *Price v. Thurmer*, 637 F.3d 831, 839 (7th Cir. 2011). It is not enough for the petitioner to prove the state courts were wrong; he must also prove they acted unreasonably. *Harrington v. Richter*, 562 U.S. 86, 101 (2005); *Campbell v. Smith*, 770 F.3d 540, 546 (7th Cir. 2014) ("An 'unreasonable application of' federal law means 'objectively unreasonable, not merely wrong; even 'clear error' will not suffice.'") (quoting *White v. Woodall*, 134 S. Ct. 1697, 1702 (2014)).

Indeed, the petitioner must demonstrate that the state court decision is "so erroneous that 'there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents.'" *Nevada v. Jackson*, 569 U.S. 505, 508–09 (2013) (quoting *Harrington*, 562 U.S. at 102). The state court decisions must "be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002); *Hartjes v. Endicott*, 456 F.3d 786, 792 (7th Cir. 2006). Further, when a state court applies general constitutional standards, it is afforded even more latitude under the AEDPA in reaching decisions based on those standards. *Knowles v.*

*Mirzayance*, 556 U.S. 111, 123 (2009); *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.").

As the Supreme Court has explained, "[i]f this standard is difficult to meet, that is because it was meant to be." *Harrington*, 562 U.S. at 102. Indeed, Section 2254(d) stops just short of "imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *See id.* This is so because "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." *Id.* at 102–03 (quoting *Jackson v. Virginia*, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court may also grant habeas relief on the alternative ground that the state court's adjudication of a constitutional claim was based upon an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2). The underlying state court findings of fact and credibility determinations are, however, presumed correct. *Newman v. Harrington*, 726 F.3d 921, 928 (7th Cir. 2013). The petitioner overcomes that presumption only if he proves by clear and convincing evidence that those findings are wrong. 28 U.S.C. § 2254(e)(1); *Campbell*, 770 F.3d at 546. "A decision 'involves an unreasonable determination of the facts if it rests upon factfinding that ignores the clear and convincing weight of the evidence.'" *Bailey*, 735 F.3d at 949–50 (quoting *Goudy v. Basinger*, 604 F.3d 394, 399–400 (7th Cir. 2010)). "'[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.'" *Burt v. Titlow*, 134 S. Ct. 10, 15 (2013) (quoting *Wood v. Allen*, 558

U.S. 290, 301 (2010)). If shown, an unreasonable factual determination by the state court means that this Court must review the claim in question *de novo*. *Carlson v. Jess*, 526 F.3d 1018, 1024 (7th Cir. 2008). A federal court also reviews a claim *de novo* where the state courts failed to "reach the merits" of the federal constitutional claim entirely. *See Cone v. Bell*, 556 U.S. 449, 472 (2009) ("Because the Tennessee courts did not reach the merits of Cone's *Brady* claim, federal habeas review is not subject to the deferential standard that applies under AEDPA to 'any claim that was adjudicated on the merits in State court proceedings' . . . . Instead, the claim is reviewed *de novo*.").[13]

## 4.    LAW & ANALYSIS

The conviction of a defendant while he is legally incompetent violates due process. *See Pate*, 383 U.S. at 378 (quoting *Bishop v. United States*, 350 U.S. 961 (1956)). "It has long been accepted that a person whose mental condition is such that he lacks the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense may not be subjected to a trial." *Drope v. Missouri*, 420 U.S. 162, 171 (1975). In federal cases, the Supreme Court has "approved a test of incompetence which seeks to ascertain whether a criminal defendant 'has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding—and whether he has a rational as well as a factual understanding of the proceedings against him.'" *Id*. at 172 (internal citation omitted). "It is not sufficient that a defendant is

---

[13]The Court need not delve into which standard of review is appropriate here because it agrees with Petitioner that in his case, "it does not matter whether the Court reviews the issue de novo or under the AEDPA's 'contrary to or unreasonable application of' standard [because] [e]ither way, applying *Pate* and *Drope* the record shows a bona fide doubt about whether Scott was competent during his trial." ECF No. 11 at 2.

oriented to time and place and has some recollection of events." *Osborne v. Thompson*, 481 F. Supp. 162, 167 (M.D. Tenn. 1979) (citing *Dusky v. United States*, 362 U.S. 402, 402 (1960)).

*Pate* held in 1966 that where the evidence raises a bona fide doubt "as to a defendant's competence to stand trial, the judge on his own motion must" conduct an inquiry into the defendant's competence, and the failure to make such an inquiry deprives the defendant of his constitutional right to a fair trial. *Pate,* 383 U.S. at 385. The Supreme Court in *Drope* reiterated that the "failure to observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial deprives him of his due process right to a fair trial." *Drope,* 420 U.S. at 172. The Supreme Court there posed the inquiry as "whether, in light of what was then known, the failure to make further inquiry into petitioner's competence to stand trial, denied him a fair trial." *Id*. at 174–75.

The Supreme Court has warned that trial courts should not rely solely on the "defendant's demeanor during trial" in concluding that the defendant is then competent when the record demonstrates a history of irrational behavior. "Although a defendant's demeanor during trial may be such as to obviate 'the need for extensive reliance on psychiatric prediction concerning his capabilities,' . . . we concluded in *Pate* [] that 'this reasoning offers no justification for ignoring the uncontradicted testimony of . . .[a] history of pronounced irrational behavior." *Id*. at 179 (citing *Pate*, 383 U.S. at 385 ("mental alertness and understanding displayed in [petitioner's] 'colloquies' with the trial judge" are insufficient to disregard uncontradicted record of pronounced irrational behavior)). And "[e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would

render the accused unable to meet the standards of competence to stand trial." *Drope,* 420 U.S. at 181. "A trial court must be attuned to the 'wide range of manifestations and subtle nuances' that might suggest incompetency at any stage of the proceedings."[14] *Balfour v. Haws*, 989 F.2d 556, 560 (7th Cir. 1989) (quoting *Drope*, 420 U.S. at 180–81).

The Court does not question the validity of Dr. Lundbohm's February 24, 2009 report concluding that Petitioner was, at that time, competent to proceed. What the Court considers critical, however, is the fact that that report was prepared six months before Petitioner ever appeared before a jury for trial.[15] Also critical was Dr. Lundbohm's acknowledgement that Petitioner had very recently ceased taking his medication and her instruction that, although she deemed Petitioner competent at that time, the court should "remain alert to any substantial changes in [Petitioner's] mental status as such changes could signal a deterioration in psychological functioning and warrant a review of his functional capacities as a defendant."[16] ECF No. 8-5 at 55. The trial court

---

[14]The Third Circuit described these requirements as follows: "In determining whether there were sufficient indicia of incompetence to warrant the trial court to order a competency evaluation or hearing on its own motion, we must consider the nature and quality of the facts known to the court, and we must consider their probative force in the aggregate, although any one factor may be sufficient depending on the circumstances." *Jermyn v. Horn*, 266 F.3d 257, 292 (3d Cir. 2001) (quoting *Drope,* 420 U.S. at 180).

[15]Somewhat concerningly, neither the trial court nor the Wisconsin Court of Appeals expressed any qualm as to the age or staleness of that report and the trial court's heavy reliance thereon. *But see Hoornweg v. Smith,* 504 F. Supp. 1189, 1193 (W.D.N.Y. 1981) ("[I]t cannot be said that the passage of one year vitiates the value of the August 1974 competency evaluations" where there was "no evidence that [petitioner's] mental state changed perceptibly, if at all").

[16]Again, neither the trial court nor the Wisconsin Court of Appeals appear to have considered, let alone acknowledged, that statement.

was, therefore, put on explicit notice that Petitioner's competent presentation at the time of his interview with Dr. Lundbohm may have been due, at least in part, to his recent medication use, which use had since been discontinued.

By the time Petitioner appeared before the jury to be tried, a significant amount of time had elapsed since Dr. Lundbohm had found him competent. The record does not indicate that in the intervening six months, Petitioner resumed consistent use of his psychotropic medication. It does not indicate that the court or Lipscomb thereafter and prior to trial confirmed, or even inquired, into whether Petitioner had continued his treatment, or whether Petitioner continued to demonstrate rational thought processing and an appreciation of his legal situation. *See Anderson v. Gipson*, 902 F.3d 1126, 1134 (9th Cir. 2018) (noting that "while there was a roughly three-month gap between" the proceedings, there was "nothing in the trial court record that suggests any amelioration of Petitioner's mental incompetence during that hiatus") (emphasis omitted); *Burt v. Uchtman*, 422 F.3d 557, 566 (7th Cir. 2005) (where the doctor's report "made the trial court fully aware that [petitioner] was a man of significantly below average intelligence with a history of psychological problems," it was insufficient for the trial court to merely ask petitioner at trial if he "had taken his medication," without making any "further inquiry into what effect the drugs were then having on him" and without giving petitioner any "further chance to elaborate").

By the time Petitioner appeared before the jury to be tried, the court knew that Petitioner had a long history of paranoid schizophrenia;[17] that he had, at some point recently preceding his competency interview with Dr. Lundbohm, ceased taking the medications that undisputedly stabilized him; that Petitioner experienced heightened paranoia, racing thoughts, nonsensical speech, and unusual behaviors when not on medication; that Petitioner had attempted to commit suicide while detained and had exhibited many other instances of inexplicable behavior such as removing his clothes in court and screaming at the wall; that Petitioner had received very little education; that Petitioner's paranoid schizophrenia was apparently severe enough to warrant financial assistance and inpatient treatment in the past; and that the doctor who evaluated Petitioner had explicitly warned the court that Petitioner's condition had the potential to deteriorate if he did not resume his treatment. The trial court had, in other words, extensive and undisputed record evidence giving the court reason to question whether Petitioner remained competent during the six-month period since he had been evaluated.

In light of all of this record evidence, neither the trial court nor the Wisconsin Court of Appeals could rely solely on what they interpreted as competent behavior by Petitioner at trial. They had an obligation to "consider and give proper weight to the record evidence" in its totality. *Drope*, 420 U.S. at 179; *see also Anderson*, 902 F.3d at 1134 (noting that,

---

[17]"The mere fact that a criminal defendant has a personality disorder does not prevent the defendant from appreciating the proceedings or assisting in his defense." *United States v. Clements*, 522 F.3d 790, 796 (7th Cir. 2008) (internal citation omitted). But the fact that Petitioner here suffered from largely untreated paranoid schizophrenia at the time of his trial is highly relevant, particularly when considered in the aggregate of the circumstances.

Case 2:22-cv-00332-JPS   Filed 04/11/23   Page 27 of 34   Document 16

considered "holistically," the trial judge should have been aware of various indicia of incompetence); *McGregor v. Gibson*, 248 F.3d 946, 955 (10th Cir. 2001) ("We emphasize that assessment of a procedural competency claim requires us to form a judgment on the aggregate[,] not the segment. We examine the totality of the circumstances: all evidence should be considered together, no single factor 'stands alone.'") (internal citation omitted). The Wisconsin Court of Appeals, per *Pate* and *Drope,* could not, as it did, rely solely on Petitioner's presentation at trial in determining that there was no bona fide doubt as to his competency. It was obligated to additionally consider the undisputed, extensive history of Petitioner's severe and largely untreated mental illness and irrational behavior. *Pate*, 383 U.S. at 386 ("While [Petitioner's] demeanor at trial must be relevant to the ultimate decision as to his sanity, it cannot be relied upon to dispense with a hearing on that very issue."); *Drope*, 420 U.S. at 175 (noting that the trial court and state appellate court concluded that the "psychiatric evaluation of petitioner . . . did not contain sufficient indicia of incompetence to stand trial to require further inquiry," but that "neither court mentioned the contrary data" and that this was error); *contrast with Woodley v. Bradshaw,* 451 Fed. App'x 529, 538 (6th Cir. 2011) ("While the Supreme Court has cautioned that 'mental alertness and understanding displayed in . . . colloquies with the trial judge' does not justify 'ignoring . . . uncontradicted testimony of [a defendant's] history of pronounced irrational behavior,' . . . here there is no such history weighing against Petitioner's mental alertness at the hearings.") (quoting *Pate*, 383 U.S. at 385–86). It is not merely that the Wisconsin Court of Appeals unreasonably weighed such evidence in concluding that there was no bona fide doubt as to Petitioner's competency at the time of trial—to the contrary, it seems to have failed to consider such

evidence at all. *See Scott,* 953 N.W.2d 113, ¶¶ 29–46 (discussing only Petitioner's trial performance in confirming that there was no bona fide doubt as to his competency).

"[E]vidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but [] even one of these factors standing alone may, in some circumstances, be sufficient." *Drope,* 420 U.S. at 180. The Court cannot conclude that Petitioner's behavior at trial was such as to obviate the need to consult the record evidence and consider other indicia of incompetence. To conclude otherwise is unreasonable. Respondent states that there was "no reason for the trial court to *sua sponte* halt the trial and order a competency evaluation because *every indication* was that Scott understood the proceedings and could assist his attorney in presenting the defense." ECF No. 14 at 13 (emphasis added); *see also id.* at 28 ("Every indication was that Scott could assist counsel and understood the proceedings."). These assertions are exaggerated and simply not accurate.

From the moment he took the stand to testify, Petitioner made comments indicating that he may not have fully understood the scope of the proceedings and his role therein. He referred to himself as being among a group of defendants—plural—while he was the sole defendant in his case. He also referred to himself as being among "fellow attorney[s]," despite not being an attorney. He discussed at length events and moments from well before the relevant time frame. He occasionally seemed to fixate on details that had no bearing or relevance to the case. Some of his comments were almost entirely incomprehensible and demonstrated disordered thought processing. Opposing counsel and the court itself acknowledged in open

court that they were "confused" by Petitioner's testimony and didn't "know what [his statement] mean[t]." ECF No. 8-13 at 4; ECF No. 8-14 at 56 These indicia—particularly when considered in light of the other record evidence of Petitioner's irrational behavior and severe mental illness, as they must be considered—established bona fide reason to doubt his competency to proceed.

The Wisconsin Court of Appeals addressed many of Petitioner's strange in-trial comments one by one, and for each comment it explained away or made a post-hoc rationalization for why Petitioner spoke as he did. For example, regarding Petitioner's comments about the "copyright machine" in front of him, the Wisconsin Court of Appeals wrote that "one reasonable interpretation is that Scott was referring to the court reporter's stenograph machine, realizing that the testimony could be read back . . . ." *Scott*, 953 N.W.2d 113, ¶¶ 43–44. It may be the case that Petitioner was, indeed, referring to the stenograph machine. But to make that and other similar inferences in isolation from Petitioner's many other confusing and off-topic comments and in isolation from the various contrary indicia in the record was procedurally erroneous and contrary to what *Pate* and *Drope* require.[18] *See Drope*, 420 U.S. at 179–80 ("[I]n considering the indicia of

---

[18]The Wisconsin Court of Appeals similarly denied any significance in Petitioner's reference to himself as being a fellow attorney and to his reference to plural defendants. "Scott's reference to my fellow attorney appears to be referring to himself as an attorney and trial counsel as his fellow attorney. Scott's particular choice of words was somewhat odd, but under the circumstances does not indicate that he did not have an understanding of the proceedings." *Scott*, 953 N.W.2d 113, ¶ 38.

These comments were not merely "odd," they were objectively incorrect and demonstrated a potential misunderstanding by Petitioner as to the scope of his case, who was involved in it, and in what capacity. These in-trial comments by Petitioner were potentially contrary to what Dr. Lundbohm recognized in

petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia . . . . ").

As in *Maxwell v. Roe*, Respondent here "inappropriately attributes great weight to the fact that [Petitioner's] counsel did not request a competency hearing" at the time of trial. 606 F.3d 561, 574 (9th Cir. 2010). Respondent writes that it is notable that Petitioner "does not argue that his attorney was ineffective for not questioning his competency during trial." ECF No. 14 at 23. While Petitioner's counsel's failure to raise the issue of his client's competency at the time of trial is relevant to whether a bona fide doubt existed as to Petitioner's competency, *see Balfour*, 892 F.2d at 561, that failure cannot absolve the trial court's own failure to do as it must in circumstances such as these—sua sponte address the issue. The record in its entirety—Petitioner's extensive history of serious mental illness, his demonstration of suicidality[19] and other irrational behavior during his detention, Dr. Lundbohm's admonition that Petitioner's mental status could deteriorate in light of his medication cessation, Petitioner's apparent inability to adhere to a consistent treatment regimen, and his disjointed and frequently incoherent testimony at trial—indisputably demonstrate a bona

---

February of 2009 at the time she interviewed Petitioner, demonstrating that her concern about Petitioner's mental deterioration may have come to fruition. *See* ECF No. 8-5 at 54 ("He subsequently described the roles of the judges, district attorney, defense attorney, and jury within the trial process with reasonable accuracy.").

[19]"We need not address the Court of Appeals' conclusion that an attempt to commit suicide does not create a reasonable doubt of competence to stand trial as a matter of law. As was true of the psychiatric evaluation, petitioner's attempt to commit suicide 'did not stand alone.'" *Drope*, 420 U.S. at 180 (quoting *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. 1972)). The same is true here—Petitioner's suicide attempt is only one of various indicia.

fide reason to doubt his competency at the time of trial, notwithstanding Lipscomb's failure to raise the issue himself.

That being the case, further inquiry into Petitioner's competency on the part of the trial court was required.

**5.      CONCLUSION**

As the Ninth Circuit wrote in *Anderson*, "[t]he issue before us is not whether [Petitioner] is competent today, or whether a court—upon review of a stale record—believes he was competent a decade ago." 902 F.3d at 1135. The question instead is whether there was a "bona fide doubt" as to Petitioner's mental competency at the time of his trial. *Id*; *see also McGregor*, 248 F.3d at 955 ("Our conclusion is based on the totality of the circumstances, and we do not state an opinion as to petitioner's actual competency to stand trial.").[20] This Court concludes that there was such bona fide doubt and that it was unreasonable to find otherwise. Because this Court concludes that the Wisconsin Court of Appeals' decision to affirm the trial court's finding that there was no bona fide doubt as to Petitioner's competency at the time of the trial was "based on an unreasonable determination of the facts in light of the evidence known by the trial judge at the time of trial and an unreasonable application of federal law as established by *Drope* [and *Pate*]," the Court will grant Petitioner's § 2254 petition. *See Maxwell* 606 F.3d 565. This conclusion echoes "the Supreme Court's encouragement to err on the side of caution in matters of competency and not to be chary in ordering psychiatric evaluations."

---

[20]Respondent writes that Petitioner "seeks automatic reversal and a new trial even though he has yet to argue, let alone prove, that he was in fact incompetent at trial." ECF No. 14 at 34. As noted, this statement misunderstands the issue now before the Court. Whether Petitioner was indeed incompetent at trial is simply not at issue and is not Petitioner's burden to prove at this juncture.

*Woodley*, 451 Fed. App'x at 538 (quoting *Drope*, 420 U.S. at 178 n.13 ("[R]esolution of the issue of competence to stand trial at an early date best serves both the interests of fairness and of sound judicial administration.")).

The issue then becomes what must now occur. In *Drope*, the U.S. Supreme Court wrote that the remaining question was "whether petitioner's due process rights would be adequately protected by remanding the case now for a psychiatric examination aimed at establishing whether petitioner was in fact competent to stand trial [at the time of the trial]." *Drope*, 420 U.S. at 183. "Given the inherent difficulties of such a *nunc pro tunc* determination under the most favorable circumstances, . . . we cannot conclude that such a procedure would be adequate here." *Id*. The Court concurs. *See also McGregor*, 248 F.3d at 962 ("Retrospective competency hearings are generally 'disfavored' but are 'permissible whenever a court can conduct a meaningful hearing to evaluate retrospectively the competency of the defendant.'") (internal citation omitted). Petitioner's trial occurred roughly thirteen years ago. His case has since been stalled in a state that can charitably be described as "limbo," primarily due to issues surrounding his competence. That being the case, the Court concludes that the "writ of habeas corpus must issue and [Petitioner] be discharged, unless the State gives him a new trial within a reasonable time." *Pate*, 383 U.S. at 386; *see also Drope*, 420 U.S. at 183 ("The State is free to retry petitioner, assuming, of course, that at the time of such trial he is competent to be tried.").

Accordingly,

**IT IS ORDERED** that Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254, ECF No. 1, be and the same is hereby **GRANTED**;

**IT IS FURTHER ORDERED** that Petitioner be released from custody within 120 days of the entry of this Order and judgment unless the State of Wisconsin elects to retry him;

**IT IS FURTHER ORDERED** that in the event Respondent elects to appeal, this Order and judgment will be stayed pending resolution of the appeal; and

**IT IS FURTHER ORDERED** that this action be and the same is hereby **DISMISSED**.

The Clerk of Court is directed to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 11th day of April, 2023.

BY THE COURT:

_____

J. P. Stadtmueller
U.S. District Judge